# United States Court of Appeals
## For the Eighth Circuit

_____

No. 12-1599

_____

Lexington Insurance Company

*Plaintiff - Appellee*

v.

Integrity Land Title Co., Inc.; Integrity Disbursing, LLC

*Defendant*s

Fidelity National Financial, Inc., as Successor by Merger to Lawyers Title
Insurance Corporation and Commonwealth Land Title Insurance Co.

*Intervenor defendant*s - *Appellant*s

_____

Appeal from United States District Court
for the Eastern District of Missouri - St. Louis

_____

Submitted: November 15, 2012
Filed: July 31, 2013

_____

Before RILEY, Chief Judge, WOLLMAN and MELLOY, Circuit Judges.

_____

MELLOY, Circuit Judge.

This declaratory judgment action concerning an errors and omissions ("E&O") insurance policy is the sixth lawsuit arising from several real estate transactions. Defendants Integrity Land Title Co. and Integrity Disbursing, LLC (collectively "Integrity"), issued title commitments, served as closing agents, disbursed construction funds, and sold title-insurance policies relating to certain real estate transactions. Intervenor Fidelity National Financial, Inc. ("Fidelity"),[1] issued the title-insurance policies and eventually paid substantial sums to settle claims on those policies. Plaintiff Lexington Insurance Company ("Lexington"), issued the disputed E&O policy to Integrity and denied coverage to Integrity for claims arising from the real estate transactions.

In the present case, Lexington seeks a declaration that it owes Integrity neither coverage nor defenses under the E&O policy. Fidelity, who hopes to recover from Lexington as well as from Integrity, intervened and asserted that it, too, desired a declaration regarding coverage. Fidelity then reversed course and moved for a stay. Fidelity argued in its motion that the district court[2] should grant a stay and allow coverage issues to be decided in one of five pending state-court actions.

The district court denied Fidelity's motion for a stay and granted summary judgment to Lexington, finding no duty to provide coverage or defenses based upon the E&O policy. Fidelity appeals the denial of its motion for a stay as well as the grant of summary judgment. We affirm.

---

[1]Fidelity is the successor to two separate title insurers who actually issued the policies in these cases. For all purposes, we refer to Fidelity and its predecessors simply as "Fidelity."

[2]The Honorable Thomas C. Mummert, III, United States Magistrate Judge for the Eastern District of Missouri, presiding by written consent of the parties pursuant to 28 U.S.C. § 636(c).

I.    Background

The underlying events that gave rise to the claims on the Fidelity title-insurance policies and the Lexington E&O policy are material to understanding the issues in this case. Lexington's denials of coverage and the district court's substantive rulings depended in large part on the E&O policy's coverage dates, the dates on which underlying events occurred, the dates on which Integrity received notice of claims, and the dates on which Integrity provided notice of claims to Lexington. Accordingly, we describe below the E&O policy, the transactions, and the claims as relevant to resolution of this appeal.

A.    The Lexington E&O Policy

Integrity applied for the E&O policy from Lexington in February 2008 and again in April 2008. Integrity's April 2008 application was the same as the February 2008 application, but with the February date crossed out and the April date written in. Based on the April 2008 application, Lexington issued a "claims made and reported" policy with a policy period from April 15, 2008, through July 15, 2009, and with a retroactive date of May 23, 2006. The policy provided $1 million in coverage as follows:

> [Lexington] will pay on behalf of [Integrity] Damages for which [Integrity] becomes legally obligated to pay because of any Claim first made against [Integrity] during the Policy Period and reported in writing to [Lexington] pursuant to the terms of this policy, within the Policy Period, or to the extent applicable, the Basic or Extended Reporting Period. Such Damages must arise out of the actual or alleged Wrongful Act first committed on or after the Retroactive Date . . . in the course of [Integrity's] rendering or failing to render Professional Services for others.

The policy contained a "Prior and Pending Litigation Exclusion" that excluded coverage for "any claim or litigation against any insured occurring prior to, or pending as of the inception date of this policy including (but not limited to) claims, demands, causes of action, legal or quasi-legal proceedings, decrees, or judgments" and "any subsequent litigation or claims arising from or based on substantially the same matters as alleged in the pleading of such prior or pending litigation." The policy also contained a "Prior Knowledge Exclusion" that excluded coverage for claims "based upon or arising out of any alleged act, error, omission or circumstance likely to give rise to a Claim that an Insured had knowledge of prior to the effective date of the this policy." Further, in the application for the policy, Integrity answered "no" to a question that asked if Integrity had knowledge of any acts, errors, or omissions that "might" give rise to a claim under the proposed policy. The policy application was expressly incorporated into and served as part of the policy. The application also warned that no coverage would extend to claims arising from such acts, errors, or omissions that Integrity had knowledge of prior to policy inception.

The policy defined "Related Claims" as "collectively all Claims involving the same Wrongful Act or Wrongful Acts which are logically or causally connected by any reason of any common fact, circumstance, situation, transaction event or decision." The policy imputed to a group of Related Claims the earliest notice date or claim-made date for any one of the Related Claims.

Finally, the policy disavowed any intention to create third-party beneficiaries and did not identify Fidelity as an additional insured entity. The policy application asked for the names of title-insurance firms for whom Integrity sold policies, and one of the companies Integrity disclosed was a predecessor to Fidelity. The policy, however, provided that no third party had the right to join an action by Integrity against Lexington and no third party had the right to sue Lexington on the policy. Finally, the policy provided that benefits were to be paid directly to parties injured by Integrity's wrongful acts and not to Integrity itself.

-4-

B.    The Transactions

Integrity performed title searches and issued title commitments on certain lakefront property as well as certain new home developments. The lakefront property at issue was sold to a first family, the Talleys, in October 2005. Integrity performed a title search and issued a title commitment to the Talleys at that time. The Talleys subsequently sold a portion of that property to a second family, the Gassens, in November 2006. Integrity performed a separate title search and provided other services to the Gassens in October and November 2006.

As to both the Talley and the Gassen title searches, Integrity failed to discover that a power company had obtained title through condemnation of land surrounding the lake up to an elevation contour of 665 feet. The title commitments Integrity issued for the Talleys and the Gassens purported to cover lakefront property from the 660-foot elevation contour and higher, thus erroneously characterizing the land actually conveyed to the Talleys and Gassens. Integrity also failed to identify other interests in the property held by additional third parties. When issuing title commitments to the Talleys and the Gassens, Integrity also sold to both families title-insurance policies underwritten by Fidelity. In this regard, Integrity was acting as Fidelity's agent. Fidelity eventually incurred substantial attorneys fees and expenses and paid substantial sums to the Talleys and Gassens due to the infirmities with their titles.

Later, from January 2007 through August 2008, Integrity issued title commitments and title-insurance policies covering fifty-nine different properties in residential developments being built by a firm named Bower & Bailey. In the title-insurance policies for the Bower & Bailey properties, Integrity failed to include exclusions from coverage for later-filed mechanics liens. In addition, before issuing title commitments, Integrity failed to investigate whether subcontractors had been paid. Further, Integrity acted as a disbursing agent for certain aspects of the

development of these properties, was responsible for releasing some funds to contractors, and failed to obtain lien waivers prior to releasing those funds.

Bower & Bailey eventually failed, leaving subcontractors unpaid and leading to subcontractors' lawsuits and mechanics liens. Fidelity asserts that it paid over $1.5 million to satisfy claims and liens related to the Bower & Bailey developments and incurred hundreds of thousands of dollars in attorneys fees.

### C. The Underlying Lawsuits and the Provision of Notice to Lexington

#### 1. Bower & Bailey/Contemporary Flooring Litigation

On March 17, 2008, one of the unpaid subcontractors for the Bower & Bailey properties, Contemporary Flooring and Design, Inc. ("Contemporary Flooring"), filed a lawsuit in Missouri state court against eighty-one defendants, including two parties identified as "Integrity Disbursing, LLC, Trustee" and "Integrity Land Title, Trustee" (the "Contemporary Flooring litigation"). Contemporary Flooring presented separate claims in its complaint identifying separate parcels of property and naming different defendants as relevant to each parcel. The claims against Integrity named Integrity as a defendant only as the trustee of deeds of trust and sought determinations of priority of title as between Integrity and Contemporary Flooring (who had filed mechanics liens against the properties).[3]

Also in March 2008, Integrity received notices from homeowners in the Bower & Bailey developments and forwarded at least fifteen lien claims to Fidelity. A newspaper article published in March 2008 quoted Integrity's president as stating that

---

[3]The Contemporary Flooring litigation evolved into larger, consolidated litigation involving liens and subsequently filed actions by other contractors. Additional details regarding the expanded nature of the Contemporary Flooring litigation are not material to this appeal.

homeowners should forward information about liens to Integrity and that "in most cases [title] insurance should cover the liens." That same month, Integrity's president referred to the situation involving unpaid subcontractors and liens on the Bower & Bailey properties as the "Bower & Bailey debacle."

When applying for the E&O policy in April 2008, Integrity did not disclose to Lexington the March 2008 lawsuit, the March 2008 notices from homeowners, the fact that Integrity had begun forwarding claims to Fidelity, or any related information.

In February 2009, after Fidelity received demands from title-insurance policyholders, provided defenses to such policyholders, and made payments to lien claimants, Fidelity sought indemnification from Integrity. In March 2009, Integrity sought coverage pursuant to the E&O policy with Lexington and tendered Fidelity's demand for indemnification to Lexington. Lexington initially provided a defense to Integrity under a reservation of rights relating to Fidelity's indemnification demands. In July 2009, however, Lexington denied coverage and ceased providing a defense. Lexington asserted that Contemporary Flooring's state-court lawsuit, filed in March 2008, related to the same alleged underlying wrongful acts and omissions that gave rise to the title-insurance claims against Fidelity and Fidelity's indemnification demands against Integrity. Lexington concluded that coverage was excluded because the Contemporary Flooring litigation predated the effective date of the E&O policy and because the facts giving rise to Bower & Bailey-related claims were known to Integrity when Integrity submitted its April 2008 application to Lexington for the E&O policy.

### 2. Talley Litigation

In December 2008, the Talleys filed a lawsuit in Missouri state court against multiple parties, including Integrity, Fidelity, and the parties who sold the lakefront property to the Talleys (the "Talley litigation"). Integrity tendered a claim to

Lexington based upon the Talley's demands, and Lexington denied both coverage and a defense. Lexington asserted that the alleged wrongful acts and omissions that gave rise to the claim occurred no later than October 2005, when Integrity provided services to the Talleys. According to Lexington, because October 2005 preceded the E&O policy's retroactive date of May 23, 2006, claims arising from those wrongful acts and omissions were not covered even if the actual claims were made and reported to Lexington during the policy period. In the present appeal, no party argues that there should be E&O coverage for the claims arising from the alleged October 2005 wrongful acts involving the Talleys.

### 3. Gassen Litigation

The Gassens filed a lawsuit in state court against multiple parties, including Integrity, Fidelity, and the Talleys, in August 2009 (the "Gassen litigation"). The Gassen litigation subsequently was consolidated with the Talley litigation. In April 2010, three weeks prior to a scheduled trial date for the combined suits, a representative of Integrity wrote to a claims examiner for Lexington to request a defense and coverage for the Gassen litigation. Eventually, through counsel, Lexington denied Integrity's request for coverage of the Gassen litigation.

Lexington asserted four reasons for denying coverage to Integrity. First, Lexington asserted that the Gassens did not make their claim against Integrity until after expiration of the E&O policy's period for making claims. Specifically, the Gassens filed suit against Integrity and others in August 2009, and the period for making claims under the E&O policy expired in July 2009. Second, Lexington argued that the Talley and Gassen claims were not "Related Claims" as defined by the policy and that the earlier date of notice for the Talley claim should not be imputed to the Gassen claim. In support of this argument, Lexington asserted that, even though some of the same property was at issue, the Gassen claim was based on a separate lawsuit involving a separate real estate transaction and a separate title search

-8-

by Integrity for separate clients. Third, Lexington argued that Integrity did not report the claim to Lexington during the policy's period for reporting claims. Finally, Lexington argued that even if coverage might otherwise apply, Integrity provided notice to Lexington regarding the Gassen claim a mere three weeks prior to trial and thereby failed to satisfy a contractual obligation from the E&O policy to provide timely notice and cooperation to Lexington. There is no allegation that Lexington was made a party to the Gassen litigation or that Lexington had notice of the Gassen claim prior to Integrity's request for a defense and coverage in April 2010, shortly before trial.

### 4. Fidelity's Talley and Gassen Litigation

On June 7, 2010, Fidelity, the Talleys, and the Gassens sued Integrity and Lexington in Missouri state court to recover for losses relating to Integrity's actions or omissions in the Talley and Gassen transactions ("Fidelity's Talley and Gassen litigation"). Fidelity asserted contract and tort claims against Integrity based upon an agency and indemnification agreement between Fidelity and Integrity. Fidelity also asserted third-party beneficiary claims against Lexington.

Lexington moved to dismiss for lack of standing. In successfully resisting Lexington's motion to dismiss, Fidelity argued that the case *did not* involve interpretation of the E&O policy. Specifically, in written arguments to the state court filed on September 14, 2010, Fidelity argued:

> [T]his is not a declaratory judgment action. [Fidelity's] Petition does not cite to the Declaratory Judgment Act, *nor does it seek interpretation of the E&O policy which provides coverage for [Fidelity's] losses.* The causes of action asserted against Lexington are well pleaded third-party beneficiary claims, requesting damages against Lexington. Thus, because [Lexington's motion to dismiss] is premised entirely on the Declaratory Judgment Act and there is no such claim asserted in this

case, Lexington's motion fails to set forth any valid ground which would warrant dismissal.

(Emphasis added).

The state court denied Lexington's motion to dismiss.

### 5. Fidelity's Bower & Bailey Litigation

On July 30, 2010, Fidelity sued Bower & Bailey, Integrity, and Lexington in state court seeking to recover funds Fidelity paid to settle claims under Fidelity's title-insurance policies on properties in the Bower & Bailey developments ("Fidelity's Bower & Bailey litigation"). Fidelity asserted third-party beneficiary claims against Lexington based upon the E&O policy. In response, Integrity again sought coverage from Lexington relating to claims arising from the Bower & Bailey transactions. On September 10, 2010, Lexington again denied coverage, stating, "As provided in our denial of July 10, 2009, Integrity Land Title Company, Inc. was aware of the Claims and/or Related Claims at least as early as March 17, 2008, prior to the Policy's inception date . . . ."

### 6. The Present Action

On November 15, 2010, with the five above-described actions already filed in state court, and after Fidelity argued to the state court that its third-party beneficiary claims against Lexington did not seek interpretation of the E&O policy, Lexington brought the present declaratory judgment action in federal district court. Lexington named only Integrity as a defendant. Lexington identified all five state-court actions and sought a declaration that it owed no duty to provide defenses and coverage to Integrity.

On January 12, 2011, Fidelity moved to intervene and filed a proposed intervenor's complaint. Fidelity argued that it should be allowed to intervene as a matter of right pursuant to Federal Rule of Civil Procedure 24(a)(2), and as a matter of permission pursuant to Rule 24(b)(1)(B). In its motion and proposed complaint, Fidelity asserted unequivocally that, like Lexington, it sought a declaratory ruling as to the coverage issues Lexington raised in its federal complaint. Lexington, as the plaintiff in the declaratory judgment action, did not object to Fidelity's proposed intervention. Integrity stated no position on the matter.

Fidelity argued that Integrity was required by the terms of agency agreements with Fidelity to carry E&O insurance and that adverse resolution of Lexington's declaratory judgment action would impede Fidelity's ability to protect its own interests. Fidelity also argued that it filed the motion to intervene early in the federal litigation and that intervention would result in no prejudice to the original parties. On February 10, 2011, the district court agreed and granted the motion to intervene as a matter of right pursuant to Rule 24(a)(2).

A few months later, on April 20, 2011, Fidelity reversed course and moved to stay the federal proceedings. In its motion to stay, Fidelity argued that it did not want the federal court to resolve the coverage disputes. Fidelity asserted that the coverage disputes were raised in the final two underlying state-court lawsuits (Fidelity's Talley and Gassen litigation and Fidelity's Bower & Bailey litigation) and that the federal court should allow those state courts to resolve coverage issues.

Lexington resisted the motion to stay. Lexington argued that Fidelity should be estopped from seeking a stay after intervening with a complaint demanding resolution of the coverage issues. Lexington also resisted the motion based upon standards generally applicable for staying federal declaratory judgment actions in the face of earlier-filed state-court actions.

The district court denied Fidelity's motion for a stay under the standards for abstention in declaratory judgment actions. The district court referenced, but did not rely upon, Lexington's theory of estoppel. Lexington and Fidelity then filed cross-motions for summary judgment. The district court granted summary judgment to Lexington, finding no duty to provide coverage or defenses for any of the claims and holding: (1) Lexington did not receive notice of the Gassen claim until after the period for reporting Claims under the E&O policy had expired; (2) the Gassen claim was not asserted against Integrity until after the policy's coverage period had expired; (3) the Gassen claim was not a Related Claim entitled to the benefit of the earlier notice date for the Talley claim; (4) even if the Gassen claim had otherwise been covered by the policy, notice to Lexington shortly before trial violated a condition of the policy requiring timely notice and cooperation; (5) coverage for claims related to the Bower & Bailey transactions was precluded by several different exclusions in the policy because (a) the Contemporary Flooring litigation preceded the policy's effective date, (b) Integrity failed to disclose the Contemporary Flooring litigation when applying for the policy and later claims arose from the same operative facts (prior pending litigation exclusion), (c) Integrity had knowledge of the underlying disputes prior to the policy's effective date (prior-knowledge exclusion), and (d) the claims were based upon Integrity's failure to obtain lien waivers (lien-waiver exclusion); and (6) Fidelity was not a third-party beneficiary of the E&O policy.

Fidelity now appeals the denial of its motion for a stay. Fidelity also appeals the grant of summary judgment in favor of Lexington, but only as to the claims related to the Bower & Bailey transactions and as to the determination that Fidelity is not a third-party beneficiary of the E&O policy.

II.     Discussion

        A.      Motion to Stay

                1.      Standards Applicable to Staying Declaratory Judgment Actions

"Generally, a federal district court must exercise its jurisdiction over a claim unless there are exceptional circumstances for not doing so." Scottsdale Ins. Co. v. Detco Indus., Inc., 426 F.3d 994, 996 (8th Cir. 2005) (citation and internal quotation marks omitted); see Colo. River Water Conservation Dist. v. United States, 424 U.S. 800, 817–18 (1976) (stating that federal courts have a "virtually unflagging obligation . . . to exercise the jurisdiction given them"). This general rule, however, yields to practical considerations and substantial discretion when the federal complaint seeks a declaration pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201(a). Wilton v. Seven Falls Co., 515 U.S. 277, 282 (1995) ("[D]istrict courts possess discretion in determining whether and when to entertain an action under the Declaratory Judgment Act, even when the suit otherwise satisfies subject matter jurisdictional prerequisites."). The Supreme Court has described discretion under the Declaratory Judgment Act as "unique and substantial," id. at 286, emphasizing that the Act "provides that a court '*may* declare the rights and other legal relations of any interested party seeking such declaration.'" Id. (quoting 28 U.S.C. § 2201(a) (1988 ed., Supp. V)). The Court characterized this language as a "textual commitment to discretion" that "distinguish[es] the declaratory judgment context from other areas of the law in which concepts of discretion surface." Id. at 286–87.

The full scope of a district court's discretion to grant a stay or abstain from exercising jurisdiction under the Declaratory Judgment Act differs depending upon whether a "parallel" state court action involving questions of state law is pending. Scottsdale, 426 F.3d at 999. Where such an action is pending, a district court enjoys broad discretion. Id. at 997. This broad discretion is to be guided by considerations

-13-

of judicial economy, Brillhart v. Excess Ins. Co. of Am., 316 U.S. 491, 495 (1942), by "considerations of practicality and wise judicial administration," Wilton, 515 U.S. at 288, and with attention to avoiding "[g]ratuitous interference" with state proceedings, Brillhart, 316 U.S. at 495.

Where no such parallel state action is pending, discretion to abstain or grant a stay still exists, but that discretion is less broad and is to be exercised according to a six factor test that our Circuit has adopted:

> (1) whether the declaratory judgment sought "will serve a useful purpose in clarifying and settling the legal relations in issue";
> (2) whether the declaratory judgment "will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the [federal] proceeding";
> (3) "the strength of the state's interest in having the issues raised in the federal declaratory judgment action decided in the state courts";
> (4) "whether the issues raised in the federal action can more efficiently be resolved in the court in which the state action is pending";
> (5) "whether permitting the federal action to go forward would result in unnecessary 'entanglement' between the federal and state court systems, because of the presence of 'overlapping issues of fact or law'"; and
> (6) "whether the declaratory judgment action is being used merely as a device for 'procedural fencing'—that is, 'to provide another forum in a race for res judicata' or 'to achiev[e] a federal hearing in a case otherwise not removable.'"

Scottsdale, 426 F.3d at 998 (alteration in original) (quoting and adopting a test articulated by the Fourth Circuit in Aetna Cas. & Sur. Co. v. Ind-Com Elec. Co., 139 F.3d 419, 422 (4th Cir. 1998) (per curiam)).

The determination of whether suits are parallel, therefore, is a threshold determination for identifying the extent of a district court's discretion to grant a stay. "Suits are parallel if 'substantially the same parties litigate substantially the same

-14-

issues in different forums.'" Id. at 997 (quoting New Beckley Mining Corp. v. Int'l Union, United Mine Workers, 946 F.2d 1072, 1073 (4th Cir.1991)).  The Supreme Court has described such suits as presenting "the same issues, not governed by federal law, between the same parties."  Brillhart, 316 U.S. at 495.  These descriptions are necessarily imprecise given the wide array of issues—and varying articulations of similar issues—that may arise in arguably related litigation.  As a functional matter, though, state proceedings are parallel if they involve the same parties or if the same parties may be subject to the state action and if the state action is likely to fully and "satisfactorily" resolve the dispute or uncertainty at the heart of the federal declaratory judgment action.  Id. at 495 (describing the inquiry as "whether the questions in controversy . . . can better be settled in the proceeding pending in state court").  We may therefore consider the likelihood that a state court will resolve the issues later presented in federal court, and we may also consider the likely completeness of any such state-court resolution when assessing whether the earlier-filed actions involve "substantially the same issues."  Scottsdale, 426 F.3d at 997 (citation and internal quotation marks omitted).

We review for abuse of discretion the district court's denial of Fidelity's motion for a stay in this declaratory judgment action.  Cont'l Cas. Co. v. Advanced Terrazzo & Tile Co., 462 F.3d 1002, 1006 (8th Cir. 2006).  We review *de novo* "whether parallel proceedings were pending in state court at the time [Lexington] brought the declaratory judgment action."  Id.

2.    Application to the Present Case

Lexington argues on appeal that the district court found the state-court actions to be not parallel to the federal declaratory judgment action and properly exercised its limited discretion when applying the Scottsdale factors.  Lexington also argues that Fidelity should be judicially estopped from seeking a stay after (1) intervening via an intervenor's complaint and claiming a desire to resolve the coverage issues in

-15-

federal court; (2) previously arguing in state court that the state actions did not involve a coverage question; and (3) inducing Lexington not to resist Fidelity's proposed intervention. Fidelity argues that judicial estoppel is inapplicable on the present facts. Fidelity also argues the district court failed to make a parallelism determination and improperly focused on all five prior actions when only the two prior suits filed by Fidelity involved coverage disputes. Fidelity argues that, as a result of the absence of a parallelism determination, the district court misconstrued the full scope of its discretion to grant a stay, erroneously applied the Scottsdale factors rather than the Wilton framework, and, ultimately, erred in denying the stay.

The district court characterized the issue in the present action as "whether Lexington has a duty to defend and indemnify Integrity in three groups of claims, *i.e.*, the Contemporary Flooring claims, the Talley claims, and the Gassen claims." Regarding the Contemporary Flooring litigation, the court noted that eighty-one defendants were named in the case and Lexington was not a party to the suit. The court concluded that the Contemporary Flooring litigation would not afford an opportunity to resolve "the uncertainty of Lexington's duties to Integrity." The district court also noted that Fidelity already had settled the Talley litigation and the Gassen litigation. The Talley litigation and the Gassen litigation, therefore, could not be deemed parallel proceedings at the time the district court ruled on the motion for a stay. There is no allegation that the settlements in the Talley litigation and Gassen litigation somehow defined or touched upon Lexington's duties towards Integrity.

Finally, in reference to Fidelity's Talley and Gassen litigation and Fidelity's Bower & Bailey litigation, the district court noted that Fidelity had only identified Lexington as a defendant in reference to third-party beneficiary claims. The court described Fidelity's claims against Integrity as alleging "breach of contract, negligence, negligent misrepresentation, negligent concealment, indemnification," and "breach of agency agreement." The court concluded that the suits brought by Fidelity were separate actions in two different judicial districts involving many

-16-

separate issues that would not necessarily resolve the uncertainty of Lexington's duties to Integrity. The district court concluded:

> Moreover, the issues about that coverage can be more efficiently resolved in this court than *in the two state court actions* [filed by Fidelity], each in a different judicial circuit, in which the coverage issue is but one of many issues. And, in the Contemporary Flooring case, Lexington is not even a defendant. Thus, the uncertainty of Lexington's duties to Integrity in that case would remain even after *the other two state court actions* have been resolved. Permitting this case to proceed would not result in an unnecessary entanglement of the federal and state court systems, nor has there been any showing that this action was initiated as a device for procedural fencing. Indeed, any such fencing could arguably be attempted to be erected by Fidelity, who intervened on the grounds that, inter alia, no prejudice would result from its entry into this litigation and who now urges a stay of the litigation until two state court actions with some of the same issues and with no trial date have been resolved.

(Emphases added).

We interpret the district court's analysis as reflecting a determination that the state and federal proceedings were not parallel: the district court identified the five earlier-filed state-court lawsuits and concluded that the first three state-court lawsuits were dissimilar to the federal action. The court then identified differences between the remaining state and federal litigation and proceeded to analyze the propriety of the stay in a manner consistent with the six-factor <u>Scottsdale</u> test.[4]

---

[4]To the extent Fidelity argues that the district erred by considering all five prior lawsuits when assessing the propriety of a stay, we reject Fidelity's arguments. As quoted with emphasis above, the court focused its analysis on Fidelity's two state-court actions. We agree with the district court that the Contemporary Flooring litigation would not resolve coverage issues as between Lexington and Integrity and

Keeping in mind the functional rationale for using different standards when parallel proceedings exist, we also agree that Fidelity's two earlier-filed actions were not parallel to the present case. Even though Fidelity, Integrity, and Lexington were all parties to Fidelity's two state-court actions, it does not seem likely that those actions, as pled and argued by Fidelity, would fully or satisfactorily resolve the uncertainty surrounding Lexington's duties toward Integrity. Resolution of Fidelity's tort and contract claims against Integrity would demand no interpretation of the E&O policy nor clarify for Lexington whether it owed a defense to Integrity in Fidelity's two lawsuits (or if it owed Integrity reimbursement of any defense costs associated with the other state-court actions).

Further, the possible state-court resolution of Fidelity's third-party beneficiary claims against Lexington could occur in several different ways, many of which would not require the state court to address Lexington's duty towards Integrity. For example, the state court could simply view the contractual relationship between Lexington and Integrity as not supporting Fidelity's claim to third-party beneficiary status. Such an approach would involve an analysis of the insurance contract (and potentially, additional evidence) to determine Lexington's and Integrity's intentions regarding third-party beneficiaries. See, e.g., L.A.C. *ex rel.* D.C. v. Ward Parkway Shopping Ctr. Co., 75 S.W.3d 247, 260 (Mo. 2002) (en banc) (analyzing the "four corners of the contract" to determine whether the parties intended to benefit a third party). If a state court were to take this approach, it would leave untouched the

would not touch upon Lexington's duty to defend Integrity. We also agree that the separate Talley litigation and Gassen litigation, which had been settled before the district court ruled on the motion for a stay, were not pending parallel proceedings. To the extent Fidelity takes issue with the district court's failure to use the term "parallel" expressly in its written order, our review of the threshold parallelism determination is *de novo,* and we agree that the proceedings were not parallel. Cont'l Cas. Co., 462 F.3d at 1006.

questions of coverage and defenses at issue in the present case. Given the presence of language in the E&O policy disclaiming third-party rights against Lexington, it seems unlikely that a state court would find it necessary to address coverage issues as between Integrity and Lexington in order to resolve Fidelity's claim to third-party beneficiary status under the E&O contract.

In this regard, and as discussed further below, we find Fidelity's own arguments in Fidelity's Talley and Gassen litigation to be instructive. Fidelity expressly argued to the state court that its third-party beneficiary claims against Lexington did not require the state court to interpret coverage issues as between Lexington and Integrity.[5] Notwithstanding this argument, it is possible that state-court resolution of the third-party beneficiary claims could involve clarification of Lexington's duties towards Integrity. For example, a court could address a third-party beneficiary claim by assuming such status exists but resolving coverage issues in a manner so as to resolve the third-party claim. See, e.g., Morelock-Ross Props., Inc. v. English Vill. Not-for-Profit Sewer Corp., 308 S.W.3d 275, 278 n.6 (Mo. Ct. App. 2010) (assuming third-party beneficiary status and resolving the case by interpreting the underlying contract). Such an analysis would clarify Lexington's duty to provide coverage to Integrity, if not its separate duty to provide defenses. We cannot say, however, that such an analysis or resolution was likely to take place in the underlying state-court actions given the express contractual language in the E&O policy denying the intention to vest third parties with the ability to hale Lexington into court. We also

_____

[5]Fidelity made factual and legal assertions in its complaint that were interpretations of the E&O policy. Fidelity, however, did not make demands for relief that necessarily required interpretation of the Lexington's duties towards Integrity. Our references to Fidelity's arguments in motions before the state court should not be viewed as a determination that Fidelity is judicially estopped from making any of its present arguments in federal court. We merely refer to Fidelity's shifting positions to illustrate that it remained uncertain whether the issues raised in the declaratory judgment action were likely to be addressed in the pending state court actions.

do not see any suggestion in the state-court pleadings or in the parties' briefs that these actions would have clarified Lexington's duty to defend Integrity in the various underlying proceedings.

Although the same parties were involved in the federal action and in Fidelity's state-court actions, and although some of the same issues could have arisen, we do not believe it is likely that the state-court actions actually would clarify and resolve the issues presented in federal court. We therefore believe the district court correctly determined those actions were not parallel.

Turning to application of the Scottsdale factors, 426 F.3d at 998, we find no abuse of discretion in the district court's denial of Fidelity's motion for a stay. The first, second, and fourth factors—"whether the declaratory judgment sought will serve a useful purpose in clarifying and settling the legal relations in issue"; "whether the declaratory judgment will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the [federal] proceeding"; and "whether the issues raised in the federal action can more efficiently be resolved in the court in which the state action is pending," id.—can be viewed as supporting denial of the stay. As noted by the district court, the state-court cases involved wholly distinct issues concerning Integrity's potential breaches of contractual and tort duties towards Fidelity. Resolution of coverage issues in state court was by no means certain and the presence of multiple unrelated issues made *efficient* resolution even less certain. In contrast, the coverage issues regarding the E&O policy were front and center in the federal case. Further, no party suggests that the third factor—"the strength of the state's interest in having the issues raised in the federal declaratory judgment action decided in the state courts"—is particularly weighty in the present case.

Regarding the fifth Scottsdale factor, the same considerations that caused us to find a lack of parallel proceedings also show that "permitting the federal action to

go forward" in this instance "would [not] result in unnecessary 'entanglement' between the federal and state court systems, because of the presence of 'overlapping issues of fact or law.'" Id.

Finally—and on the present facts, importantly—the sixth factor strongly supports the district court's election to exercise jurisdiction and deny Fidelity's motion for a stay. Lexington was sued in state court in different judicial districts several times. The Talleys named Lexington as a defendant in the Talley litigation in December 2008. Next, in August 2009, the Gassens named Lexington as a defendant in the Gassen litigation. In June and July 2010, Fidelity named Lexington as a defendant in Fidelity's Bower & Bailey litigation as well as Fidelity's Talley and Gassen litigation. Then, on September 14, 2010, Fidelity interpreted its own state-court complaint and represented that its complaint "does not cite to the Declaratory Judgment Act, *nor does it seek interpretation of the E&O policy which provides coverage for [Fidelity's] losses*." (Emphasis added).

Approximately two months later, in November 2010, Lexington filed the present action. Consequently, we do not view Lexington as having used the declaratory judgment action "merely as a device for procedural fencing—that is, to provide another forum in a race for res judicata or to achieve a federal hearing in a case otherwise not removable." Scottsdale, 426 F.3d at 998 (citations and internal quotation marks omitted). Rather, Lexington's entry into federal court appears to have been a much-delayed choice to seek a federal declaratory judgment in fairly direct response to *Fidelity's* assertion that the same coverage issues were *not* present in the state-court actions. This response occurred not in the context of one earlier-filed suit but in the context of ongoing litigation taking place in multiple districts, addressing Lexington's duties only in piecemeal fashion (if at all), and involving disparate issues. Such a response does not appear to be an inappropriate attempt to

thwart the first-filer's choice of forum nor does it appear to be an improper race for *res judicata* or procedural fencing.

Fidelity cites several cases for the proposition that district courts abuse their discretion when refusing to abstain or issue stays in situations like this. Fidelity's cases simply do not control on the present facts. Further, Fidelity fails to acknowledge the scope of the district court's discretion. Our review of cases addressing abstention in the context of the Declaratory Judgment Act reveals that it is relatively uncommon for reviewing courts to find discretion abused when a district court elects to exercise jurisdiction. See Capitol Indem. Corp. v. Haverfield, 218 F.3d 872, 877 (8th Cir. 2000) (Loken, J., dissenting) (discussing the rarity of appellate courts finding abuses of discretion where district courts exercise jurisdiction under the Declaratory Judgment Act). And when such abuses are found, there typically are distinguishing factors not present in this case.

In Haverfield, for example, we held that a district court abused its discretion by denying a motion to stay a declaratory judgment action filed by an insurer seeking a coverage determination in the face of parallel proceedings. There, we described the parallel proceedings as involving "the same parties, the same issue, the same insurance policies, and the same arguments." Id. at 875. Haverfield involved no suggestion that the state-court plaintiff had represented to the state court that it was not seeking a coverage determination. Further, in finding an abuse of discretion, we carefully examined the underlying substantive argument and emphasized that it involved an unsettled question of state law subject to a split in the state's own courts. We determined that on such facts and in the face of an intrastate split, it was prudent to allow the state courts to resolve their own split of authority rather than having a federal district court issue a nonprecedential interpretation of the issue. Accordingly, an exercise of federal jurisdiction in Haverfield would have been a highly inefficient

-22-

incursion by the federal courts into an area of state law that required clarification by the state's own courts.

In BASF Corp. v. Symington, 50 F.3d 555, 559 (8th Cir. 1995), also cited by Fidelity, we held it was an abuse of discretion for a district court to entertain a declaratory judgment action in the face of an earlier-filed state complaint seeking substantive relief. Symington, however, preceded the Supreme Court's decision in Wilton and also preceded our decision in Scottsdale. In Symington, our decision rested largely on a determination that the declaratory judgment plaintiff had participated in inappropriate forum shopping merely to thwart the state-court plaintiff's choice of forum and to invoke a more favorable statute of limitations. We stated that "[d]eclaratory judgment actions may on occasion merit 'a closer look' to ensure that the declaratory plaintiff is not motivated by forum-shopping concerns." Id. at 558 (quoting Nw. Airlines, Inc. v. Am. Airlines, Inc., 989 F.2d 1002, 1007 (8th Cir. 1993)). And we concluded that suits "'for declaratory judgment aimed solely at wresting the choice of forum from the natural plaintiff will normally be dismissed.'" Id. (quoting Allendale Mut. Ins. Co. v. Bull Data Sys., Inc., 10 F.3d 425, 431 (7th Cir. 1993)). Because we determined in Symington that the declaratory judgment plaintiff had participated in inappropriate forum shopping to thwart the state-court plaintiff's choice of forum, and because we find no improper procedural fencing or forum shopping in the present case, Symington does not persuade us that the present case involves an abuse of discretion.

In Royal Indemnity Co. v. Apex Oil Co., 511 F.3d 788, 796 (8th Cir. 2008), we held that a district court did not abuse its discretion by abstaining after an insurance company brought a declaratory judgment action seeking clarification of the rights of multiple insurance companies regarding environment contamination. Again, Apex Oil is unlike the present case in that there is no suggestion in Apex that the state-court plaintiff had disclaimed a desire to resolve the same issues in state court. Even if the

facts of Apex Oil could be deemed analogous to the present facts, however, our holding that the district court in Apex Oil *did not* abuse its discretion by abstaining in no way implies that future courts necessarily abuse their discretion by *refusing* to abstain. See City of Jefferson City, Mo. v. Cingular Wireless LLC, 531 F.3d 595, 604–05 (8th Cir. 2008) (stating that even though Brillhart holds that district courts with jurisdiction are "not required to exercise that jurisdiction, . . . Brillhart does not suggest . . . that the district court . . . was required to abstain" (internal citation omitted)).

In Cincinnati Indemnity Co. v. A&K Construction Co., 542 F.3d 623, 624 (8th Cir. 2008), we held that a district court erred by finding that it lacked jurisdiction to address a workers compensation claim where diversity jurisdiction existed. We also held, however, that in light of a pending state administrative action before the Missouri Department of Labor and Industrial Relations and a pending declaratory judgment action in state court, the district court should have abstained to allow "the state proceedings . . . to resolve the issue . . . which [would] result in uniform decisions within the state's statutory scheme." Id. at 625. In reaching this conclusion, we also noted that the parties and issues were identical and we expressly avoided addressing any questions of state administrative exhaustion. Id. Here, no such complicating factors exist.

The present case is more akin to Continental Casualty Co. v. Advance Terrazzo & Tile Co., 462 F.3d 1002, 1007 (8th Cir. 2006), where we held a district court did not abuse its discretion by refusing to abstain. The "parallel proceeding" question was simpler in Continental Casualty than in the present case because, unlike the present case, the insurance company had not been named in the underlying state-court proceedings. Still, in applying Scottsdale, we "discern[ed] no improper procedural maneuvering by the insurance companies," and no strong state interests nor improved efficiencies demanding abstention. Id.

-24-

In summary, the district court enjoys discretion when applying Scottsdale, and we conclude that the district court did not abuse its discretion in denying the motion for a stay.[6]

B.    Summary Judgment

Fidelity's appeal from the adverse grant of summary judgment is limited. Fidelity conceded prior to the district court's ruling that the E&O policy provided no coverage for the Talley claim.  And Fidelity is no longer seeking to recoup its losses related to the Gassen claim.  Further, Fidelity does not argue that coverage exists specifically for the actual claims raised in the March 2008 complaint filed by Contemporary Flooring in the Contemporary Flooring litigation (which preceded the effective date of the E&O policy).  Rather, Fidelity argues that its own later demand upon Integrity for indemnification of sums paid to settle claims made on the Bower & Bailey title-insurance policies (as eventually expressed in Fidelity's Bower & Bailey litigation) is a separate claim that the district court mistakenly conflated with the Contemporary Flooring litigation.  Fidelity argues that the district court erred in holding that the E&O policy provided no coverage for the later claim stemming from Fidelity's indemnification demand upon Integrity.  We review a grant of summary judgment de novo.  Carmody v. Kan. City Bd. of Police Comm'rs, 713 F.3d 401, 404 (8th Cir. 2013).

Although the district court and the parties address several different competing theories regarding coverage and potentially applicable exclusions, we find it necessary to address only two exclusions in the E&O policy: the prior-knowledge

_____

[6]Because we conclude it was proper for the district court to deny Fidelity's motion to stay these federal proceedings, we need not address Lexington's alternative argument concerning judicial estoppel.

-25-

exclusion and the lien-waiver exclusion. We hold that both exclusions, independently and in the alternative, preclude coverage for the claim as articulated by Fidelity on appeal. In reaching this holding, we assume without deciding that Fidelity is correct when it argues that the Contemporary Flooring litigation and Fidelity's subsequent, but factually intertwined, indemnification demand upon Integrity may be treated as separate "Claims" under the E&O policy. We also assume without deciding that coverage might otherwise extend to the narrow claim as articulated by Fidelity on appeal, and we assume no other exclusions apply to defeat coverage.

### 1.     The Prior-Knowledge Exclusion

The E&O policy provided:

> This policy shall not apply to any Claim
>
> . . .
>
> Based upon or arising out of any alleged act, error, omission or circumstance *likely to give rise to a Claim* that an Insured had knowledge of prior to the effective date of this policy. This exclusion includes, but is not limited to any prior Claim or possible Claim referenced in the insured's application.

(Emphasis added). In addition, the application asked for disclosure of information similar to information referenced in the above-quoted prior-knowledge exclusion:

> 15.     Does any person or entity proposed for insurance have knowledge of any act, error or omission which might give rise to a claim(s) under the proposed policy?

In the application, Integrity's president answered "no" to question 15. The application provided, "If a policy is issued, the application is attached to and made

-26-

a part of the policy so it is necessary that all questions be answered in detail." Finally, the application stated:

> Applicant and Insurer agree that with respect to Questions 14, 15 and 16 above, that if such knowledge . . . exists, then any litigation, claim, action, proceeding, investigation, or occurrence arising out of, in connection with, relating to or which is a part of (I) such known acts, errors and omissions . . . is excluded from any coverage which may be afforded on the basis of this application.

The effective date of the policy was April 15, 2008, and the application was dated April 1. On March 13, Integrity received calls from homeowners in the Bower & Bailey developments reporting that they were being served with liens, and Integrity forwarded the calls to Fidelity. Still in March, Integrity forwarded to Fidelity via email fifteen lien claims that homeowners had received. On March 17, Contemporary Flooring served its state-court complaint upon Integrity. The complaint described in detail Bower & Bailey's failure to pay Contemporary Flooring for work performed on many properties and Contemporary Flooring's filing of mechanics liens on those properties. The complaint asserted rights in those properties, by virtue of the liens, superior to the titleholders and sought damages. A newspaper article published in March 2008 regarding the failure of the Bower & Bailey quoted Integrity's president as saying property owners should be contacting their title insurers and that most claims should be covered by title insurance.

In addition, Integrity's president stated during his own Rule 30(b)(6) deposition that he received a request from Fidelity for a copy of an indemnification agreement between Integrity and Bower & Bailey in March 2008. And the same request was referenced in an email between Integrity's president and his secretary. Notwithstanding this request and the naming of Integrity as a defendant in the

Contemporary Flooring litigation, Integrity's president testified that he did not believe Integrity was likely to face liability regarding the Bower & Bailey properties.

Finally, a senior vice president/regional major-claims attorney for Fidelity who served as Fidelity's Rule 30(b)(6) designee described the entities likely to be impacted by the information Integrity had received prior to policy inception. He explained that a firm like Integrity, upon discovering that subcontractors had not been paid and lien waivers had not been obtained, would have known that its clients and its title-insurer underwriter were "in trouble":

> Q. Because if I understand correctly, if I'm a land title agent like Integrity and I get notice or information that subs on a project for which I'm doing work as a title agent aren't being paid, then that could mean big problems, can't it?
> A. If I'm getting notice from some source.
> Q. The subs themselves?
> A. Then yes, absolutely it can be a problem.
> Q. Because I've got to protect my buyer. I've got to protect myself. I've got to protect my underwriting company from claims; isn't that correct?
> A. Your duties are going to run severalfold there. You're certainly going to want to—since you're acting as agent for the buyer, yes, you want to protect your buyer. You're acting as the agent for the company with your ear to the ground, then you want to protect the company. So those are just two of the people that certainly you want to watch our for.
> . . .
> Q. [T]he truth of the matter is if a land title agent like Integrity gets notice that sub[contractors] aren't being paid on a given project, and that agent has worked—the title agent—for a bunch of sales within that project, then the title agent—what happens is the antennae of concern goes up. I could be in trouble, my clients the buyers could be in trouble, my underwriter could be in trouble. True?

-28-

A.    Yes.

Q.    Claims could be made against some or all of us.  True?

A.    Yes.

Based on the foregoing, including the opinion of Fidelity's own designee regarding the meaning and impact of such knowledge within the industry, we have little trouble concluding that Integrity had actual knowledge of facts that could possibly give rise to lien claims against property owners, title-insurance claims against Fidelity, and, ultimately, indemnification claims against Integrity.  Based on the language of the policy's prior-knowledge exclusion, however, the questions we must answer are (1) whether such known facts demonstrated that the possible future indemnification claim was "likely," and (2) based upon the application, whether such known facts demonstrated that such a future claim "might" be filed.[7]

Fidelity argues that information Integrity possessed prior to policy inception did not show that an indemnification claim by Fidelity was "likely."  According to Fidelity, nothing had taken place at the time of policy inception to finally establish Fidelity's own liability on its title-insurance policies.  And by extension, nothing had happened to give rise to a potential indemnification claim against Integrity.  In this regard, we believe that Fidelity is attempting to read the terms "likely" and "might" out of the policy and application, respectively, and demanding a degree of certainty inconsistent with the policy language.  Simply put, if we were to adopt Fidelity's

_____

[7]As noted above, the application was expressly incorporated into the policy. It is not clear to us why the policy application and separate exclusion use different terms. We believe, however, that the term "might" (as used in the application) under any plain and reasonable interpretation indicates a requirement for lesser degree of certainty than the term "likely" (as used in the separate exclusion). We apportion the burden of proof to Lexington to prove the applicability of the exclusion contained in the application. Stark Liquidation Co. v. Florists' Mut. Ins. Co., 243 S.W.3d 385, 394 (Mo. Ct. App. 2007).

position, the prior-knowledge exclusion would exclude only coverage for ripened claims that had already been made or were certain to be made as of the time of policy inception. We reject this position as an unreasonable interpretation of the terms "likely" and "might."

In support of its position, Fidelity cites Freemont Indemnity Co. v. Lawton-Byrne-Bruner Insurance Agency Co., 701 S.W.2d 737, 741 (Mo. Ct. App. 1985). In Freemont, the Missouri Court of Appeals held that a similar exclusion did not apply, even though an applicant for an E&O insurance policy knew prior to policy inception that one of its own clients had sent a letter to state regulators complaining about the applicant's provision of services. The subject of the letter later ripened into a lawsuit, and the E&O insurer attempted to invoke the prior-knowledge exclusion. Importantly, the Missouri Court of Appeals noted that the state regulators had communicated with the applicant and that the applicant "considered the matters raised in the [client's letter to regulators] to be closed." Id. at 743. Based largely on the determination that the applicant reasonably believed the matter was settled, the Missouri Court of Appeals held:

> "[K]nowledge of any circumstance which might result in a claim," as stated in [the E&O] policy, must mean knowledge more reasonably substantial and certain than [the applicant's] knowledge in the present case which was limited to an understanding that it had successfully responded to the [client's] letter of inquiry to the [state regulators] and that the matter was fully resolved.

Id.

Here, in contrast, the timing of Integrity's receipt of information about its own potential liability and Fidelity's potential liability in no similar way excuses Integrity's failure to make a disclosure. It is not reasonable to conclude that Integrity could have

-30-

believed that the matter was settled or unlikely to result in claims against Integrity. Rather, the entire situation with the Bower & Bailey's failure—described by Integrity's president as a "debacle"—was unfolding contemporaneously with Integrity's application to Lexington for the E&O policy. The present case, therefore, contains no possibility of a finding like that in Freemont which held, essentially, that the later-filed lawsuit was a surprise to the insured based upon the knowledge possessed at policy inception. Here, Integrity's president had stated publicly that title insurance would cover most lien claims, he knew that claims would be made against Fidelity, and he knew that his firm had failed to protect Fidelity and landowners.

Fidelity also relies upon Sager v. St. Paul Fire & Marine Insurance Co., 461 S.W.2d 704, 707 (Mo. 1971). In Sager, the issues presented were not similar to the present case. There, the policy at issue was an occurrence-based attorney-malpractice policy rather than a claims-made policy. The court had to determine whether an attorney had given notice "[a]s soon as practicable" after "receiving information as to any occurrence covered by" his malpractice insurance policy. Id. at 706 (internal quotation marks omitted). The issue before the court was whether an "occurrence" had taken place at various early points during the attorney's ill-fated representation of a client or whether an occurrence did not take place until later, when the representation eventually culminated in the attorney missing a statutory deadline. The issue was not whether a prior-knowledge exclusion applied nor was the state court in Sager called upon to determine the degree of certainty required to make such an exclusion applicable. The Missouri Supreme Court concluded simply that, notwithstanding the lawyer's knowledge that a deadline would be missed, the "occurrence" did not actually take place until the deadline passed. Id. at 707. We decline the invitation to rely upon Sager's specific interpretation of the term "occurrence" in an occurrence-based policy to answer the unrelated question of how to interpret the prior-knowledge exclusion in a claims-made policy.

Because we conclude the information Integrity undisputedly possessed at the policy's inception showed that the future indemnification demand by Fidelity was "likely," we conclude Lexington has established that the prior-knowledge exclusion applies.

### 2. Lien-Waiver Exclusion

Lexington's E&O policy excluded coverage for "any claim arising out of any release of funds without receipt of . . . appropriate waivers or releases of liens from any contractor, subcontractor, or materials or service provider[.]" Lexington did not assert this exclusion as a basis for denying coverage when Integrity tendered Fidelity's indemnification demands to Lexington. As a result, Fidelity argues Lexington is estopped from asserting the lien-waiver exclusion to defeat coverage. Fidelity also presents a causation-type argument, asserting that the exclusion is inapplicable because Fidelity's indemnification claims do not arise out of Integrity's failure to secure lien waivers or Integrity's failure to include exclusions for future lien claims in the title-insurance policies sold to homeowners in the Bowers & Bailey development. According to Fidelity, the claims arise out of Bower & Bailey's failure to pay subcontractors.

Regarding the estoppel argument, Fidelity overstates the extent to which an insurer in Missouri is limited by the arguments first advanced to deny coverage. Missouri law is clear: an insurer cannot deny coverage on one ground, induce prejudicial reliance by the insured, and then later assert a new and *inconsistent* ground for the denial of coverage. Brown v. State Farm Mut. Auto. Ins. Co., 776 S.W.2d 384 (Mo.1989) (en banc); see Cedar Hill Hardware & Const. Supply, Inc. v. Ins. Corp. of Hannover, 563 F.3d 329, 342 (8th Cir. 2009) ("Estoppel applies only where an insurer raised inconsistent defenses and, by raising inconsistent defenses, caused prejudice to the insured.") The present lien-waiver exclusion is not inconsistent with the prior-knowledge exclusion, and Fidelity does not explain how

the failure to raise the lien-waiver exclusion earlier can be viewed as prejudicial. Further, there is no suggestion in the present case that Lexington expressly waived any defenses. Simply put, nothing in Missouri law or the present facts precludes Lexington from adding the separate and not-inconsistent lien-waiver exclusion to support its denial of coverage.

Regarding the causation arguments, Fidelity takes too narrow a view of causation. Fidelity is correct when it asserts that the failure of the general contractor to pay subcontractors was a cause of Fidelity's eventual liability on the title-insurance policies (and by extension a cause of Fidelity's demand upon Integrity for indemnification). It is also true, however, that Fidelity's liability was caused by Integrity issuing the underlying title-insurance policies without including exclusions for later-filed mechanics liens and by Integrity's failure to secure lien waivers before releasing funds or issuing title commitments.

As noted by the district court, Fidelity's complaint in its Bower & Bailey litigation cited as negligence on Integrity's part the following acts: (1) failure to obtain lien waivers; (2) failure to place funds into escrow; (3) failure to apply funds to unpaid contractors; and/or (4) failure to postpone closing pending payment to contractors. In the same complaint, Fidelity alleged these acts were the direct and proximate causes of damages to Fidelity in the form of title-insurance claims defended and paid by Fidelity. The Fidelity indemnification claims, therefore, were claims "arising out of any release of funds without receipt of . . . appropriate waivers or releases of liens from any contractor, subcontractor, or materials or service provider[.]"

Because we conclude Lexington neither waived nor is estopped from asserting the lien-waiver exclusion, and because we conclude the lien-waiver exclusion applies, we also affirm the determination of no coverage on this alternative basis.

-33-

III.    Conclusion

The district court did not abuse its discretion in denying the motion for a stay. In addition, the district court properly granted summary judgment regarding Fidelity's indemnification claims.  Because no party appeals the underlying rulings regarding the lack of coverage for any other claims, we do not consider the propriety of the district court's election to address third-party beneficiary status nor its substantive determination as to that issue.

We affirm the judgment of the district court.

_____