RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 14a0289p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

WESTERN WORLD INSURANCE COMPANY,

*Plaintiff-Appellee*,

*v.*

No. 13-2388

BURT HOEY, et al.,

*Defendants*,

MARY ARMBRUSTER,

*Defendant-Appellant*.

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
Nos. 2:12-cv-10220; 2:12-cv-10630—Julian A. Cook, Jr., District Judge.

Argued: April 29, 2014

Decided and Filed: December 8, 2014

Before: GILMAN, GIBBONS, and STRANCH, Circuit Judges.

_____

## COUNSEL

**ARGUED:** Don Ferris, FERRIS & SALTER, P.C., Ann Arbor, Michigan, for Appellant. Nicolette S. Zachary, WARD, ANDERSON, PORRITT & BRYANT, PLC, Bloomfield Hills, Michigan, for Appellee. **ON BRIEF:** Don Ferris, FERRIS & SALTER, P.C., Ann Arbor, Michigan, for Appellant. Nicolette S. Zachary, WARD, ANDERSON, PORRITT & BRYANT, PLC, Bloomfield Hills, Michigan, for Appellee.

—————————

**OPINION**

—————————

JANE BRANSTETTER STRANCH, Circuit Judge.  Mary Armbruster sued Burt Hoey in Michigan state court for negligence.  Western World, Hooey's commercial general-liability insurer, agreed to defend Hoey but reserved the right to deny coverage.  All parties then sought a declaratory judgment regarding whether Western World had a duty to defend Hoey and indemnify him if Armbruster won her negligence suit.  The district court decided to take jurisdiction and construed the policy to exclude Armbruster's injury from coverage.  We AFFIRM.

## I.  FACTS & PROCEDURAL HISTORY

Hoey, who owns the kind of farmers' market that offers hay rides, pony rides, and pumpkin picking, hired Armbruster to run the hay wagon for eight weekends.  Armbruster, who is now a paraplegic because an accident with the wagon crushed her spine, sued Hoey and his daughter Jennifer Lambers for negligence in Michigan state court.  Two more lawsuits were initiated on the same day: Armbruster, Hoey, and Lambers filed suit, again in *state* court, against Western World, Hoey's insurer, seeking a declaratory judgment that Armbruster was covered by Hoey's General Commercial Liability insurance policy; Western World, for its part, sought a declaratory judgment from the Eastern District Court of Michigan that Armbruster was *not* covered by the insurance policy.  Western World eventually removed Armbruster's state declaratory-judgment action to the Eastern District and the two cases were consolidated.  As if three lawsuits were not enough, counsel provided by Western World to Hoey filed a workers' compensation claim on the theory that Armbruster was an "employee" and therefore eligible for workers' compensation.  The state tort claim has been stayed until the workers' compensation

claim is resolved. The major question in the declaratory judgment actions is whether Armbruster was an "employee" as defined by the insurance policy.

The district court decided to take jurisdiction (which is discretionary in a declaratory-judgment action) and held that the insurance policy did not cover Armbruster's claims.

## II. JURISDICTION

The Declaratory Judgment Act provides that "[i]n a case of actual controversy within its jurisdiction . . . any court of the United States . . . may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201. The Act is "an enabling Act, which confers discretion on the court rather than an absolute right upon the litigant." *Pub. Serv. Comm'n of Utah v. Wycoff Co., Inc.*, 344 U.S. 237, 241 (1952). The Declaratory Judgment Act's "textual commitment to discretion, and the breadth of leeway we have always understood it to suggest, distinguish the declaratory judgment context from other areas of law in which concepts of discretion surface." *Wilton v. Seven Falls Co.*, 515 U.S. 277, 286-87 (1995). Federal courts, and federal district courts in particular, have "unique and substantial discretion in deciding whether to declare the rights of litigants." *Id.* at 286. "[F]acts bearing on the usefulness of the declaratory remedy, and the fitness of the case for resolution, are peculiarly within their grasp." *Id.* at 289. In light of the comparative advantage of the district courts, a district court's decision to take jurisdiction over a declaratory judgment action is reviewed for abuse of discretion. *Scottsdale Ins. Co. v. Flowers*, 513 F.3d 546, 554 (6th Cir. 2008).

That discretion, however, must not be unguided. Rather, "sound administration of the Declaratory Judgment Act calls for the exercise of 'judicial discretion, hardened by experience into rule.'" *Wilton*, 515 U.S. at 289 (quoting Edwin Borchard, *Declaratory Judgments* 293 (2d ed. 1941)). In undertaking review of a district court's decision to exercise jurisdiction over a declaratory-judgment action, this circuit identified five factors to guide the exercise of discretion. *See Grand Trunk W. R.R. Co. v. Consol. Rail Corp.*, 746 F.2d 323, 326 (6th Cir. 1984). The factors, which came directly from *Moore's Federal Practice*, were intended to be helpful

guidelines that summarize prior caselaw. *Id.* District courts in this circuit consider these five non-exclusive factors (one of which recently acquired three sub-factors) in the course of exercising their discretion. *Flowers*, 513 F.3d at 554.

The factors, often called the *Grand Trunk* factors after the case that brought the list into being in this circuit, are:

(1) Whether the declaratory action would settle the controversy;
(2) whether the declaratory action would serve a useful purpose in clarifying the legal relations in issue;
(3) whether the declaratory remedy is being used merely for the purpose of "procedural fencing" or "to provide an arena for res judicata;"
(4) whether the use of a declaratory action would increase the friction between our federal and state courts and improperly encroach upon state jurisdiction; [which is determined by asking]
    a. whether the underlying factual issues are important to an informed resolution of the case;
    b. whether the state trial court is in a better position to evaluate those factual issues than is the federal court; and
    c. whether there is a close nexus between underlying factual and legal issues and state law and/or public policy, or whether federal common or statutory law dictates a resolution of the declaratory judgment action; and
(5) whether there is an alternative remedy which is better or more effective.

*Id.* at 554 (primary factors) (quoting *Grand Trunk*, 746 F.2d at 326); *id.* at 560 (sub-factors) (quoting *Bituminous Cas. Corp. v. J&L Lumber Co., Inc.*, 373 F.3d 807, 814-15 (6th Cir. 2004)).

As the Fifth Circuit has correctly noted, the *Grand Trunk* factors and their cousins in other circuits direct the district court to consider three things: efficiency, fairness, and federalism. *Sherwin-Williams Co. v. Holmes Cty.*, 343 F.3d 383, 390–91 (5th Cir. 2003). We have never assigned weights to the *Grand Trunk* factors when considered in the abstract, *Flowers*, 513 F.3d at 563, and rightly so—the factors are not, of course, always equal. For example, a relatively efficient declaratory judgment (factors 1, 2, and 5) could very well be inappropriate if hearing the case would be unfair (factor 3) or would offend the bundle of principles we generally label "federalism" (factor 4). The relative weight of the underlying considerations of efficiency, fairness, and federalism will depend on facts of the case. The essential question is always

whether a district court has taken a good look at the issue and engaged in a reasoned analysis of whether issuing a declaration would be useful and fair. *Sherwin-Williams*, 343 F.3d at 390. As the Supreme Court noted in the early days of the Declaratory Judgment Act, "when all of the axioms have been exhausted and all words of definition have been spent, the propriety of declaratory relief in a particular case will depend upon a circumspect sense of its fitness informed by the teachings and experience concerning the functions and extent of federal judicial power." *Wycoff Co.*, 344 U.S. at 243.

In the present case, the district court succinctly considered each of the 8 factors (the five *Grand Trunk* factors plus the three sub-factors) and concluded that the benefits of taking jurisdiction outweighed the costs. Another court might have made a different choice—some judges regularly decline jurisdiction in cases like this. Turning to our role, we frame our own review within the considerations of efficiency, fairness, and federalism, and review all of the relevant facts, both those that fit squarely within the *Grand Trunk* factors and those that do not. This review leads us to conclude that the district court did not abuse its discretion when it decided to take jurisdiction.

Before we reach the factors, one fact deserves comment: In this case *everyone*—the insured, the insurer, and the tort plaintiff—wanted a declaratory judgment to determine whether Western World has a duty to defend and indemnify Hoey and Lambers. The parties disagree only about which court should issue the declaration: Hoey, Lambers, and Armburster filed their declaratory-judgment action in state court (which Western World removed to federal court) while Western World sued in the Eastern District of Michigan. That is not to say that parties' wishes should control the district court's exercise of discretion. A district court would be wise to decline jurisdiction if a declaratory action involved novel, unsettled, or complex issues of state law; if there were evidence of procedural fencing; or if the sought-after declaration would somehow be frivolous or purely advisory. This case presents none of those concerns.

Turning to the *Grand Trunk* factors, we begin with factors (1) and (2)—"whether the declaratory action would settle the controversy" and "whether the declaratory action would serve a useful purpose in clarifying the legal relations in issue." "[T]wo lines of precedent seem to have developed in our jurisprudence regarding" factors (1) and (2) "in the context of an

insurance company's suit to determine its policy liability." *Flowers*, 513 F.3d at 555 (discussing the first factor); *see also id.* at 557 (discussing the second factor). One line of cases holds that these two factors relate to whether the declaratory judgment would settle the *underlying* state-court controversy—that is, the tort action brought by the injured party against the insured—or would at least clarify the legal relationship between the parties in the underlying state-court controversy. *Id.* at 555–58. The other line of cases directs the district court to focus on the controversy between the parties in the declaratory-judgment action—that is, between the insurer and the insured. *Id.* In *Flowers*, we suggested that the split might reflect both "competing policy considerations of consolidating litigation into one court versus permitting a party to determine its legal obligations as quickly as possible," as well as differences in the factual circumstances presented by different cases. *Id*. at 555-56. In this case, the district court saw greater virtue in resolving the issue of coverage, especially because the facts concerning the coverage issue were undisputed. This conclusion was within the district court's discretion. *See Am. States Ins. Co. v. D'Atri*, 375 F.2d 761, 763 (6th Cir. 1967) ("We do not believe that, considering the purposes of the Federal Declaratory Judgment Act, the plaintiff should be forced into a waiting period of legal uncertainty respecting the obligations it has incurred in its policy.").

Factor (3) asks "whether the declaratory remedy is being used merely for the purpose of 'procedural fencing' or 'to provide an arena for res judicata.'" The term "procedural fencing" might be new to a modern reader. It appears to have been coined in the early 1930s by the late Professor Edwin Borchard, who was and remains the preeminent scholar of the declaratory judgment. In the preface to the first edition of his treatise, Borchard wrote:

> Procedure should be the "handmaid of justice," a means to an end. Instead, in all mature legal systems cultivated by a professional guild . . . procedure tends to become rigid, stereotyped, and over-technical, an end in itself, often seemingly oblivious to the practical needs of those to whose ills it is designed to minister. Litigants thus often become pawns in a game, the social cost of which is excessive and the result of which is frequently unnecessarily cumbersome and socially undesirable. Substantive rights often become the incidents of procedural fencing.

Borchard, *Declaratory Judgments*, at xiii (preface to the first edition). The phrase caught on. *Am. Auto. Ins. Co. v. Freundt* marked its first appearance in a judicial opinion: "The wholesome purposes of declaratory acts would be aborted by its use as an instrument of procedural fencing

either to secure delay or to choose a forum." 103 F.2d 613, 617 (7th Cir. 1939). The term has come to encompass a range of tactics that courts regard as unfair or unseemly. *See Sherwin-Williams*, 343 F.3d at 391. Many cases list "provid[ing] another forum in a race for res judicata" as an example of procedural fencing—the example helps the reader understand what the term means. *See, e.g.*, *Lexington Ins. Co. v. Integrity Land Title Co., Inc.*, 721 F.3d 958, 968 (8th Cir. 2013). The district court in this case did not think that Western World was playing procedural games, and we see no reason to dispute that conclusion.

The fourth factor and its subfactors reflect concerns about principles of federalism. The district court noted that this case does not raise novel or difficult questions of state law. Nor was the state trial court likely to be in a better position to evaluate the factual issues than the federal court. This case, therefore, does not raise serious concerns about federal encroachment on the state courts, such that the district court should decline jurisdiction.

Finally, we reach factor (5)—"whether there is an alternative remedy which is better or more effective." "[O]ur inquiry on this factor must be fact specific, involving consideration of the whole package of options available to the federal declaratory plaintiff." *Flowers*, 513 F.3d at 562. The district court noted that there were alternative remedies but that a federal court was not "a clearly inferior forum to resolve the issue." *Id.*

Stepping back from the *Grand Trunk* factors to view the case as a whole, the district court thought it would be helpful for the parties to know whether Western World was on the hook for Hoey's legal fees and potential liability, did not think that Western World was playing procedural games, and believed that the federal forum could resolve the declaratory action without interfering in Armbruster's tort suit or taking on difficult questions of state law. The district court did not abuse its discretion in exercising jurisdiction over this declaratory-judgment action. We turn now to review of the merits determination.

## III. CONTRACT CONSTRUCTION

The district court's decision to grant a motion for a declaratory judgment is reviewed de novo. *Flowers*, 513 F.3d at 563. Ambiguities and exemptions in an insurance contract are construed against the insurer. *Fire Ins. Exch. v. Diehl*, 545 N.W.2d 602, 687 (Mich. 1996).

*Accord Great West Cas. Co. v. Mayorga*, 342 F.3d 816, 818 (7th Cir. 2003) (Ambiguities are construed against insurers "because the[ contracts] are drafted by the insurers, because their typical wording even when clear to experts is often opaque to insureds . . . , and because insureds want insurance against the vagaries of interpretation."). But courts must take care not to find "ambiguity" if the terms of the policy are clear. *McDonald v. Farm Bureau Ins. Co.*, 747 N.W.2d 811, 816, 819 (Mich. 2008); *see also McKusick v. Travelers Indem. Co.*, 632 N.W.2d 525, 528 (Mich. Ct. App. 2001). A provision is ambiguous "when its words may reasonably be understood in different ways. . . . Yet if a contract, however inartfully worded or clumsily arranged, fairly admits of but one interpretation it may not be said to be ambiguous . . . ." *Farm Bureau Mut. Ins. Co. of Mich. v. Nikkel*, 596 N.W.2d 915, 919 (Mich. 1999).

The question here is Armbruster's status under the policy. The policy does not apply to bodily injury to an "employee," "temporary worker," or "independent contractor" (among other classifications); the first two are relevant to this case. The policy does not specifically define the term "employee." Rather, it provides only that

> "Employee" includes a "leased worker." "Employee" does not include a "temporary worker."

R. 1-1, Page ID No. 35. The policy defines "temporary worker" as follows:

> "Temporary worker" means a person who is furnished to you to substitute for a permanent "employee" on leave or to meet seasonal or short-term workload conditions.

*Id.* at Page ID No. 37. Both parties agree that Armbruster does not fall under this definition of "temporary worker" because she was not "furnished" to Hoey by a third party. Western World argues that Armbruster is therefore an "employee" and not covered; Armbruster argues that she is covered by the policy because the policy uses "temporary worker" in two different ways—in a broader sense in the definition of "employee" and in a narrower sense in the explicit definition of "temporary worker." Although she does not meet the explicit definition of "temporary worker" because she was not furnished, she argues that she is nonetheless a temporary worker for purposes of exclusion from the definition of "employee."

Western World has the better argument. The contract makes clear that "employee" is the default status for anyone who works for the insured—a worker is an "employee" unless she is a "volunteer worker," *id.;* "temporary worker," *id.*; "independent contractor," *id.* at Page ID No. 40; or someone who works for a "contractor" or "subcontractor," *id.* at Page ID 41. One could easily imagine types of "employee" that are not specifically listed in the policy—"short-term," "part-time," "seasonal," "salaried," etc.—but those people would still be "employees." To accept Armbruster's reasoning would be to require a policy to list every conceivable type of employee.

So how to define employee? The district court applied Michigan's economic-reality test, a multi-factor balancing test that asks whether the employer (1) had control of the worker's duties; (2) paid her wages; (3) could hire, fire, and discipline her; and (4) whether the worker performed her duties in order to accomplish a goal she shared with the employer. *Meridian Mut. Ins. Co. v. Wypij*, 573 N.W.2d 320, 322 (Mich. Ct. App. 1997). Although the test is normally used to determine whether someone is an "employee" under the workers' compensation law, some courts have applied it when construing an insurance contract. *Id.*; *Chicago Ins. Co. v. Chimnee Cricket*, 17 F. App'x 374, 380–81 (6th Cir. 2001). The district court noted that "[a]ccording to Armbruster's deposition, it was Hoey who (1) personally hired her, (2) paid her in cash for her work, (3) directed and controlled her work activities, and (4) had the authority to fire her." R. 26, Page ID. 367. "Thus," the district court concluded, "it appears that she fits the common understanding of an employee, albeit a temporary one." *Id.*

The district court's use of the economic-reality test could potentially have been in tension with the Michigan Supreme Court's repeated instruction that undefined terms in an insurance policy should be interpreted "in accordance with their 'commonly used meaning.'" *Allstate Ins. Co. v. McCarn*, 645 N.W.2d 20, 22 (Mich. 2002) (quoting *Frankenmuth Mut. Ins. Co. v. Masters*, 595 N.W.2d 832, 837 (Mich. 1999)); *see also Bianchi v. Auto. Club of Mich.*, 467 N.W. 2d 17, 20 n.1 (Mich. 1991) ("The terms of an insurance policy should be construed in the plain, ordinary and popular sense of the language used, as understood by the ordinary person." (internal quotation marks and alterations omitted)). Some courts have accordingly looked to the dictionary definition of "employee" when construing the term in an insurance contract. *See, e.g.*,

*Auto-Owners Ins. Co. v. Dimension Furniture Frame, Inc.*, No. 260967, 2005 WL 1750663, at *3 (Mich. Ct. App. July 26, 2005) (determining that "employee" means "a person who has been hired to work for another" (quoting *Random House Webster's College Dictionary* (2001)). In this case, any tension between the two approaches is academic because Armbruster was clearly an employee under either the economic-reality test or the common understanding of the word "employee."

This conclusion comports with the normal purpose of a commercial general-liability policy. Commercial general-liability polices usually do not cover injuries to a businesses' workers, *see, e.g.*, *Certain Interested Underwriters at Lloyd's, London v. Stolberg*, 680 F.3d 61, 66–69 (1st Cir. 2012); instead, businesses are required to maintain workers' compensation insurance, Mich. Comp. Laws § 418.611(1). *See also Amerisure Ins. Co. v. Orange and Blue Const., Inc.*, 545 F. App'x 851, 855 (11th Cir. 2013) ("Unlike worker's compensation insurance or employers' liability insurance, which exist to provide employers with coverage for injuries that occur to employees during the scope of employment, the sole purpose of commercial general liability insurance is to provide coverage for injuries that occur to the public-at-large."); *Monticello Ins. Co. v. Dion*, 836 N.E.2d 1112, 1113 (Mass. App. Ct. 2005). The language of the contract, though perhaps clumsy, is clear, as is the result: Armbruster is an "employee" and her injuries are not covered by the policy.

## IV. CONCLUSION

For the reasons stated, we find that the district court did not abuse its discretion in exercising jurisdiction over this declaratory-judgment action. We also AFFIRM the district court's determination that Armbruster's injury is excluded from coverage under the policy.