NOT RECOMMENDED FOR FULL-TEXT PUBLICATION

File Name: 16a0598n.06

Case No. 15-2237

# UNITED STATES COURT OF APPEALS
# FOR THE SIXTH CIRCUIT

HANTZ FINANCIAL SERVICES, )
INCORPORATED; HANTZ GROUP, )
INCORPORATED, )
       )
         Plaintiffs-Appellants, )
       )
v. )
       )
       )
AMERICAN INTERNATIONAL )
SPECIALTY LINES INSURANCE CO., an )
Illinois corporation, nka Chartis Specialty )
Insurance Company; AMERICAN )
INTERNATIONAL GROUP, INC.; )
NATIONAL UNION FIRE INSURANCE )
COMPANY OF PITTSBURGH, PA, a )
Pennsylvania corporation, )
       )
         Defendants-Appellees. )

**FILED**
Nov 09, 2016
DEBORAH S. HUNT, Clerk

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF MICHIGAN

BEFORE: ROGERS, SUTTON, and COOK, Circuit Judges.

COOK, Circuit Judge. In an embezzlement scheme spanning eight years, Michael Laursen, an employee of securities broker-dealer Hantz Financial Services, misappropriated over $2.6 million in client funds. Hantz Financial Services reimbursed the stolen funds to the affected clients and sought indemnification under two insurance policies: a fidelity bond from National Union Fire Insurance Company of Pittsburgh, PA ("National Union") and an errors-and-

omissions policy from American International Specialty Lines Insurance Company ("AISLIC").[1]
After both insurers denied coverage, Hantz Financial Services and its corporate parent, Hantz
Group, Inc. (collectively "Hantz"), sued National Union and AISLIC, alleging breach of contract
against each insurer and seeking penalty interest under Michigan law. The district court granted
summary judgment to both insurers, concluding that neither policy covered Hantz's losses. We
AFFIRM the district court's judgment.

## I.

### A. Factual Background

Hantz is a licensed securities broker-dealer that offers clients investment advice. Hantz
does not provide its own investment products to clients; instead, it introduces clients to
investment products offered by other financial services companies. To protect itself against risks
associated with its business model, Hantz purchased two insurance policies: a fidelity bond (the
"Bond") from National Union, and an errors-and-omissions policy (the "E&O Policy") from
AISLIC.

National Union issued the Bond to Hantz for the "Bond Period" from January 26, 2008 to
January 26, 2009. Under the Insuring Agreement of the Bond, National Union agreed to
indemnify Hantz for "[l]oss resulting directly from dishonest or fraudulent acts committed by an
Employee acting alone or in collusion with others." As stated in the parties' General
Agreements, the Bond applied to "loss of Property (1) owned by [Hantz], (2) held by [Hantz] in
any capacity, or (3) for which [Hantz] is legally liable." With respect to loss arising from
litigation against Hantz, Section F of the General Agreements provided that "the Insured may not

---

[1]National Union and AISLIC are both subsidiaries of American International Group, Inc.,
another named defendant.

bring legal proceedings for the recovery of such loss after the expiration of 24 months from the date of such final judgment or settlement."

AISLIC's E&O Policy ran from June 22, 2007 to June 22, 2008. The E&O Policy provided coverage for "the Loss of an Insured arising from . . . any actual or alleged Wrongful Act of the Insured in the rendering or failure to render Professional Services." The Policy defined "Wrongful Act" to include "any breach of duty, neglect, error, misstatement, misleading statement, omission or act by such Insureds in their respective capacities as such, or . . . by reason of their status as Directors, Officers or Employees." The Policy included an exclusion for losses in connection with claims against "an Insured . . . arising out of . . . any actual or alleged Wrongful Act committed with knowledge that it was a Wrongful Act" (the "Wrongful Act exclusion"). The Insuring Agreement under the E&O Policy also covered negligent-supervision claims arising from Hantz's financial activities as a broker-dealer:

> This endorsement shall . . . pay on behalf of the Broker/Dealer all sums which the Broker/Dealer shall become legally obligated to pay as damages resulting from any claim or claims . . . for any Wrongful Act of the Broker/Dealer or of any other person for whose Wrongful Act the Broker/Dealer is legally responsible . . . and solely in rendering or failing to render Professional Services . . . or in Failing to Supervise a Registered Representative in the rendering or failure to render Professional Services . . . on behalf of the Broker/Dealer.

Michael Laursen worked as a registered investment representative for Hantz in its Midland, Michigan office from 1999 until his death in March 2008. Between 2000 and 2008, Laursen embezzled client funds by depositing checks written or endorsed by those clients directly into his own bank accounts. His scheme unraveled in March 2008 when Brian and Penny Bolton, two of his victimized clients, served Hantz and Laursen with a Financial Industry Regulatory Authority ("FINRA") arbitration action, alleging fraud and other claims. Two days later, Laursen committed suicide.

As a result of Laursen's suicide and the FINRA arbitration claim, Hantz began to investigate whether Laursen had embezzled money. By May 2008, Hantz determined that Laursen embezzled funds from twenty-two clients. In subsequent years, eleven couples and nine individuals brought claims against Hantz for their losses without initiating litigation. Hantz settled these claims before the end of July 2009. In addition, two couples litigated against Hantz. As noted, Brian and Penny Bolton brought a FINRA arbitration action, which settled on July 24, 2009. William and Susan Monroe also filed a FINRA arbitration action, and FINRA ultimately entered an award in favor of the Monroes in June 2010. The Circuit Court for the County of Midland, Michigan entered judgment confirming the award on December 17, 2010. On January 24, 2012, the Michigan Court of Appeals affirmed the circuit court judgment. In total, Hantz paid over three million dollars to reimburse all of Laursen's affected clients.

While working to settle and litigate affected clients' claims, Hantz also sought indemnification for the costs of resolving these claims under both the Bond and the E&O Policy. In May 2008, Hantz sent National Union a Sworn Proof of Loss. Over the following two-and-a-half years, Hantz and National Union traded correspondence, National Union requesting documents and information for its coverage investigation, and Hantz updating the insurer on the financial status of its claims and demanding coverage. Finally, in March 2011 National Union denied coverage.

In April 2008, Hantz notified AISLIC of a potential claim on the E&O Policy. One month later, AISLIC concluded that it could not fully evaluate coverage, but informed Hantz that the policy's Wrongful Act exclusion might preclude coverage because Laursen knowingly misappropriated client funds. AISLIC did not communicate a final coverage decision to Hantz prior to this lawsuit.

**B. Procedural Background**

On March 18, 2013, Hantz sued National Union and AISLIC in the Eastern District of Michigan, alleging breach of contract under each insurer's respective policy. Hantz sought coverage up to each agreement's limit and claimed 12% penalty interest under the Michigan Uniform Trade Practices Act, MCL § 500.2001, et seq. A few months later, Hantz filed an amended complaint, alleging additional facts. After discovery, the parties filed cross-motions for summary judgment. The district court granted National Union's and AISLIC's motion and denied Hantz's motion. Hantz timely appealed.

**II.**

We review the district court's decision to grant summary judgment de novo, affirming if the evidence demonstrates that no genuine issue exists as to any material fact and that National Union and AISLIC are entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Ramsey v. Penn Mut. Life Ins. Co.*, 787 F.3d 813, 818 (6th Cir. 2015). A dispute is genuine if a reasonable jury could return a verdict in Hantz's favor. *Tysinger v. Police Dep't of Zanesville*, 463 F.3d 569, 572 (6th Cir. 2006). "The court must view the evidence in the light most favorable to [Hantz] and draw all reasonable inferences in its favor." *Id.*

Since "[s]ubject matter jurisdiction in this case is premised solely on diversity of the parties," we apply state law in accordance with the controlling decision of the highest state court to analyze the issues in dispute. *See Tooling, Mfg. & Techs. Ass'n v. Hartford Fire Ins. Co.*, 693 F.3d 665, 670 (6th Cir. 2012). The parties agree that Michigan law governs the interpretation of both insurance policies.

In Michigan, a court interprets an insurance policy "similar[ly] to any other contractual agreement." *Hunt v. Drielick*, 852 N.W.2d 562, 565 (Mich. 2014). We must therefore

"determine what the agreement was and effectuate the intent of the parties." *Id.* (quoting *Auto-Owners Ins. Co. v. Churchman*, 489 N.W.2d 431, 433–34 (Mich. 1992)); *see also Rory v. Cont'l Ins. Co.*, 703 N.W.2d 23, 28–29 (Mich. 2005) (applying contract interpretation principles to the interpretation of an insurance policy). In ascertaining an insurance policy's meaning, Michigan courts "give the words used . . . their plain and ordinary meaning . . . apparent to a reader of the instrument." *Rory*, 703 N.W.2d at 28. To this end, Michigan courts enforce insurance policies according "to their unambiguous terms," or "*as written.*" *Id.* at 30.

We address Hantz's claims under the Bond and E&O Policy in turn.

## A. The Bond

The district court concluded that the Bond did not cover Hantz's claimed losses because they were not "direct" losses and, on that basis, granted summary judgment to National Union. But we begin by assessing the threshold question of whether Hantz timely brought its lawsuit under the Bond's twenty-four month contractual limitations provision. Finding resolution of that issue dispositive as to all of Hantz's claimed losses, we affirm the district court judgment. *See United States v. Henderson*, 626 F.3d 326, 334 (6th Cir. 2010) ("A decision below must be affirmed if correct for any reason, including a reason not considered by the lower court." (quoting *United States v. Childs*, 539 F.3d 552, 559 (6th Cir. 2008))).

As noted, Michigan courts enforce unambiguous policy language "*as written.*" *Rory*, 703 N.W.2d at 30. Accordingly, "an unambiguous contractual provision providing for a shortened period of limitations is to be enforced as written unless the provision would violate law or public policy." *Id.* at 31. "Only recognized traditional contract defenses [e.g., duress, waiver, estoppel, or fraud] may be used to avoid the enforcement of the contract provision." *Id.* at 31, 31 n.23.

For purposes of assessing the applicable limitations periods under the Bond, we group Hantz's claimed losses into three categories: (1) claims arising out of settlements with the 20 clients (eleven couples and nine individuals) who did not litigate against Hantz (totaling $1,967,423.60); (2) claims arising out of Brian and Penny Bolton's FINRA arbitration action (totaling $600,000); and (3) claims arising out of William and Susan Monroe's FINRA arbitration action (totaling $587,063). At oral argument, Hantz's counsel conceded that the Bond's limitations provision barred its claims related to the 20 non-litigating clients. We therefore address only the timeliness of Hantz's claims with respect to the Boltons and the Monroes.

Because Hantz's losses related to these clients involved litigation, Section F governs the timeliness of its claims. That section provides that the Insured "may not bring legal proceedings [against National Union] for the recovery of such loss[es] after the expiration of 24 months from the date of such *final judgment* or *settlement*" (emphasis added). Hantz settled with the Boltons on July 24, 2009. The Circuit Court for the County of Midland, Michigan entered an "Order of Judgment" confirming the Monroes' FINRA arbitration award on December 17, 2010. July 24, 2011 thus marked twenty-four months after the date of the Bolton settlement, and December 17, 2012 marked twenty-four months after the date of the circuit court judgment. Yet Hantz did not file the present lawsuit until March 18, 2013—well after the limitations periods appear to have expired for both the Bolton and Monroe losses.

Hantz nevertheless raises two arguments in an attempt to salvage these claims. We consider each in turn.

### 1) **The Monroe Claims and the Date of "Final Judgment"**

First, Hantz contests the expiration of the contractual limitations period for the Monroe claims. Though acknowledging that the Midland County Circuit Court Order of Judgment would constitute a "final judgment" under Michigan law, it contends that the "Michigan-specific" definition of final judgment does not govern interpretation of the Bond's terms. From there, it argues that the words "final judgment" in the Bond are ambiguous and could refer to a judgment resolving any appeals, rather than the lower court judgment itself. Hantz thus asserts that, construing the term "final judgment" against the insurer, the court should consider the date of final judgment to be the date that the Michigan Court of Appeals *affirmed* the Midland County Circuit Court's Order of Judgment, January 24, 2012.

The Bond does not define "final judgment." But in Michigan, "[t]he fact that a[n] [insurance] policy does not define a relevant term does not render the policy ambiguous." *Henderson v. State Farm Fire and Cas. Co.*, 596 N.W.2d 190, 194 (Mich. 1999). Instead, the test for ambiguity is whether the "words may *reasonably* be understood in different ways." *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 544 (6th Cir. 2007) (quoting *UAW-GM Human Res. Ctr. v. KSL Recreation Corp.*, 579 N.W.2d 411, 414 (Mich. Ct. App. 1998)). If a term in an insurance policy is ambiguous, it should be construed against the insurer, *Henderson*, 596 N.W.2d at 194, but Michigan law instructs us not to "create ambiguity where the terms of the contract are clear," *City of Grosse Pointe Park v. Mich. Mun. Liab. & Prop. Pool*, 702 N.W.2d 106, 113 (Mich. 2005) (quoting *Frankenmuth Mut. Ins. Co. v. Masters*, 595 N.W.2d 832, 837 (Mich. 1999)); *see also Farm Bureau Mut. Ins. Co. of Mich. v. Nikkel*, 596 N.W.2d 915, 920 (Mich. 1999) (noting that "the most fundamental principle of

contract interpretation [is that] the court may not read ambiguity into a policy where none exists").

Here, it is clear from the context of the section in which "final judgment" appears—a section entitled "Notice of Legal Proceedings Against [the] Insured"—that the words refer to a specific point in a legal action or case. In that way, the Bond clearly employs the term for its legal meaning. "As a general rule, where terms having a definite legal meaning are used in a written contract, the parties to the contract are presumed to have intended such terms to have their proper legal meaning, absent a contrary intention appearing in the instrument." *Northland Ins. Co. v. Stewart Title Guar. Co.*, 327 F.3d 448, 455 (6th Cir. 2003) (quoting *Conagra, Inc. v. Farmers State Bank*, 602 N.W.2d 390, 401 (Mich. Ct. App. 1999)). Accordingly, while "[t]he Michigan Supreme Court employs dictionary definitions to interpret nontechnical terms, [it] uses specialized dictionaries and caselaw to interpret legal terms of art." *Minges Creek, L.L.C. v. Royal Ins. Co. of Am.*, 442 F.3d 953, 956 (6th Cir. 2006) (citing *Twichel v. MIC Gen. Ins. Corp.*, 676 N.W.2d 616, 622 (Mich. 2004); *Henderson*, 596 N.W.2d at 195, 195 n.9).

Canvassing Michigan case law, we glean that Michigan courts use the term "final judgment" to refer to the trial court's order ending litigation at *that* level. *See, e.g.*, *Dep't of Agric. v. Appletree Mktg., L.L.C.*, 779 N.W. 2d 237, 240 (Mich. 2010); *Mich. Dep't of Transp. v. Tomkins*, 749 N.W.2d 716, 719 (Mich. 2008); *Ayar v. Foodland Distribs.*, 698 N.W.2d 875, 877 (Mich. 2005) (per curiam); *Huggett v. Dep't of Natural Res.*, 629 N.W.2d 915, 918 (Mich. 2001); *Twp. of Bingham v. RLTD R.R. Corp.*, 624 N.W.2d 725, 728 (Mich. 2001); *Doe v. Boyle*, 877 N.W.2d 918, 920, 923 (Mich. Ct. App. 2015) (per curiam); *New Prop., Inc. v. George D. Newpower, Jr., Inc.*, 762 N.W.2d 178, 186 (Mich. Ct. App. 2009). Specifically, the term "final judgment" in Michigan courts' legal parlance routinely denotes a trial court's order resolving all

pending claims that a party may appeal as of right. *See, e.g.*, *Children's Hosp. of Mich. v. Auto Club Ins. Ass'n*, 545 N.W.2d 592, 594–95 (Mich. 1996) (citing Mich. Ct. R. 7.203(A)(1)); *Greater Macedonia Baptist Church v. Nat'l Bank of Detroit*, 475 N.W.2d 359, 360 (Mich. 1991) (concluding it lacked jurisdiction over an appeal because the district court had not entered final judgment); *see also* 7A Mich. Pl. & Pr. § 53:10 (2d ed.) ("Unless otherwise provided by statute or court rule, a judgment or order is appealable of right only if it is 'final.' This principle was declared by the courts long ago, and is expressly recognized and reiterated by court rule.") (citations omitted). Also, though not controlling, the Michigan Court Rules define the term "final judgment" in a civil case as "the first judgment or order that disposes of all the claims and adjudicates the rights and liabilities of all the parties." Mich. Ct. R. 7.202(6)(a)(i); *see also Cole v. Auto-Owners Ins. Co.*, 723 N.W.2d 922, 925 n.2 (Mich. Ct. App. 2006) (citing the definition of "pedestrian" in a Michigan statute to support its conclusion that the term was not ambiguous when used in an insurance contract).

Michigan courts are not alone in using the term in this way—federal courts almost universally refer to the judgment of a district court ending litigation on the merits as a "final judgment," a concept frequently articulated in the context of the "final-judgment rule." *See, e.g.*, *Mohawk Indus., Inc. v. Carpenter*, 558 U.S. 100, 106–07 (2009) (noting that parties are ordinarily not entitled to an appeal until "final judgment has been entered"); *Kitchen v. Heyns*, 802 F.3d 873, 875 (6th Cir. 2015) (declining to exercise appellate jurisdiction when the lower court had "not yet reached final judgment"). Definitions of the term found in specialized legal dictionaries are in accord. *See Final Judgment*, *Black's Law Dictionary* (10th ed. 2014) (defining final judgment as "[a] court's final determination of the rights and obligations of the parties in a case," which includes "any order *from which an appeal lies*") (emphasis added);

*Final-Judgment Rule*, *Black's Law Dictionary* (10th ed. 2014) (defining "final-judgment rule" as the "principle that a party may appeal only from a district court's final decision that ends the litigation on the merits"); *accord Final Judgment*, *Oxford Dictionary of Law* (7th ed. 2014) (defining "final judgment" as "the judgment in civil proceedings that ends the action, usually the judgment of the court at trial" and stating that "[a]ppeal against a final judgment may be made without leave of the court").

Accordingly, as a legal term of art, "final judgment" virtually always designates the judgment by a court that determines all the rights and obligations of the parties in a case *so that it can be appealed*—not a judgment that has been resolved after appeal. Mindful that we must not read ambiguity into contracts where none exists, we do not find Hantz's proposed construction of the term to be a reasonable alternative interpretation. And no other language that could support its reading of "final judgment"— i.e., words like "appeal," "exhaust," "affirm," or "deny"— appears anywhere in this section of the Bond.[2]

At oral argument, Hantz's counsel also posited that a hypothetical reasonable businessperson could interpret "final judgment" to mean the judgment after all appeals are exhausted. But when a contract uses a legal term of art, the court interprets the term according to its *legal* meaning. *See Northland Ins. Co.*, 327 F.3d at 455. And, as discussed at length, the term

---

[2]At oral argument, Hantz's counsel identified only one case, a Connecticut Court of Appeals decision, that held that the term "final judgment" is ambiguous. *See Aetna Life & Cas. Co. v. Braccidiferro*, 643 A.2d 1305, 1309 (Conn. Ct. App. 1994). We are not bound by that court's holding, and in any event, the facts of that case are clearly distinguishable because the court there interpreted language in a Connecticut statute. *See id.* Hantz's counsel also suggested that some Michigan cases addressing the issue preclusion doctrine interpret the finality of a court decision to be affected by a pending appeal, thus making use of the term "final judgment" in the Bond ambiguous. We fail to see how this narrow area of case law, none of which Hantz cites in its briefs, supports a reasonable alternative interpretation of the term "final judgment," especially given how it is used in the Bond.

"final judgment" has a legal meaning, designating an order appealable as of right because it resolves all claims. To the extent Hantz argues that we should graft a businessperson's reasonable expectations onto this unambiguous term, Michigan law precludes us from doing so. *Wilkie v. Auto-Owners Ins. Co.*, 664 N.W.2d 776, 786 (Mich. 2003) ("The rule of reasonable expectations clearly has no application to unambiguous contracts. That is, one's alleged 'reasonable expectations' cannot supersede the clear language of a contract.")

For these reasons, "final judgment" is unambiguous, and the date of the Midland County Circuit Court's Order of Judgment, December 17, 2010, marked the date of final judgment for Hantz's claims related to the Monroe litigation. As a result, these claims expired in December 2012, three months before Hantz filed suit.

## 2) *The Bolton Claims and Equitable Estoppel*

Hantz does not dispute the expiration of the Bond's contractual limitations period for its Bolton litigation claims. Hantz argues, however, that National Union should be equitably estopped from enforcing the provision because the insurer implicitly waived it. According to Hantz, the insurer "induced Hantz to believe" that the limitations clause would not be enforced. In support, Hantz points to National Union's extensive and lengthy investigation of Hantz's claims, citing a series of letters that Hantz and National Union exchanged between February 2010 and March 2011. Hantz argues that National Union implicitly waived enforcement of the Bond's limitations provision when it demanded and obtained Hantz's cooperation with its internal claims investigation.

In Michigan, courts treat implied waiver and equitable estoppel as functionally the same doctrine. *See Reed Estate v. Reed*, 810 N.W.2d 284, 290 (Mich. Ct. App. 2011) ("Proof of express words is not necessary, but the waiver may be shown by circumstances or by a course of

acts and conduct which amounts to an estoppel." (quoting *Klas v. Pearce Hardware & Furniture Co.*, 168 N.W. 425, 427 (Mich. 1918))); *see also Landelius v. Sackellares*, 556 N.W.2d 472, 476 (Mich. 1996) ("There are some circumstances, however, wherein justice requires that a person be treated *as though* he had waived a right where he has done some act inconsistent with the assertion of such right and without regard to whether he knew he possessed it. This is the doctrine of estoppel.").

"For equitable estoppel to apply [in the context of a contractual limitations period], [a] plaintiff must establish that (1) defendant's acts or representations induced plaintiff to believe that the limitations period clause would not be enforced, (2) plaintiff justifiably relied on this belief, and (3) [plaintiff] was prejudiced as a result of [his or] her reliance on [his or] her belief that the clause would not be enforced." *McDonald v. Farm Bureau Ins. Co.*, 747 N.W.2d 811, 819 (Mich. 2008). Michigan courts are generally "reluctant to recognize an estoppel in the absence of conduct clearly designed to induce the plaintiff to refrain from bringing action within the period fixed by statute." *Lothian v. City of Detroit*, 324 N.W.2d 9, 18 (Mich. 1982) (citations and quotations omitted).

National Union's contractual limitations defense survives despite its investigative efforts. No evidence supports Hantz's argument that National Union "induced" Hantz to believe it would not enforce the limitations clause. Although National Union spent nearly three years investigating Hantz's claims and requested Hantz's cooperation throughout the process, it never implied it would waive the contractual limitations provision, nor did it suggest that it would cover the losses. Quite the contrary: National Union's letters conveyed that the insurer planned to contest coverage, albeit on grounds other than the Bond's limitations period. In a November 11, 2010, letter, for example, National Union provided Hantz with a summary of information that

"caused [National Union] to believe coverage may not be available with respect to this alleged loss." Hantz argues that National Union should have expressly stated its intent to enforce the limitations period, as opposed to its other defenses, but the insurer's failure to specify which defenses it would assert does not constitute a waiver of those defenses by any stretch.

Hantz also fails to identify record evidence that could lead a reasonable juror to find justifiable reliance on the part of Hantz's counsel. In its communications with Hantz, National Union stated repeatedly that it did not waive any rights or defenses under the Bond. And when National Union ultimately denied Hantz's claims, the insurer again stated that it "reserve[d] all rights and defenses." Even assuming that National Union was responsible for unnecessary delays in the claims investigation process, as Hantz contends, delay alone won't support a reliance finding. *See McDonald*, 747 N.W.2d at 820 ("The trial court's factual finding that defendant caused delays is insufficient to grant estoppel because there is no evidence that plaintiff relied on anything defendant did or said.").

Without any justified waiver or estoppel defense to revive Hantz's untimely claims, we uphold the district court's judgment. As a result, we need not address the parties' arguments with respect to National Union's other asserted bases for denying coverage under the Bond.

**B.  The E&O Policy**

The district court concluded that the Wrongful Act exclusion in the E&O Policy barred coverage for Hantz's claims, because the policy excluded indemnification for claims against "an Insured . . . arising out of . . . any actual or alleged Wrongful Act *committed with knowledge* that it was a Wrongful Act." Under the E&O Policy, "Insured" persons included Hantz and its directors, officers, and employees.

The parties do not dispute that Laursen knowingly stole client funds. Nevertheless, Hantz makes two arguments contending that the district court erred in reaching its conclusion. Both miss the mark.

Hantz first argues that the use of the word "knowledge" under the Wrongful Act exclusion is ambiguous and could mean "knowledge attributable to the insured against whom the claim is made, knowledge attributable to the insured who committed the wrongful act, or knowledge attributable to any insured." Construing this purported ambiguity against AISLIC, Hantz proffers that only one insured party had knowledge of Laursen's fraud—Laursen—and thus Hantz, without such knowledge, can claim coverage under the E&O Policy.

Although Michigan law counsels courts to construe ambiguities in an insurance contract against the insurer, *Western World Ins. Co. v. Hoey*, 773 F.3d 755, 762 (6th Cir. 2014) (citing *Fire Ins. Exch. v. Diehl*, 545 N.W.2d 602, 606 (Mich. 1996)), Hantz's argument relies upon a strained reading of the exclusion, creating possible ambiguities where none exist. In the phrase, "Wrongful Act committed with knowledge that it was a Wrongful Act," "with knowledge" clearly modifies the verb "committed." In other words, the clause plainly refers to the "knowledge" of the Insured who "committed" the Wrongful Act. We will not entertain unreasonable alternative interpretations of this clause. Because Laursen indisputably knew that what he was doing was wrongful, the exclusion applies.

Hantz next claims that the district court's reading of the Wrongful Act exclusion renders coverage under the E&O Policy illusory. Hantz cites the E&O Policy's negligent supervision rider, which extends coverage for negligent supervision claims arising out of Hantz's financial activities as a broker-dealer. Hantz suggests that the district court's interpretation of the Wrongful Act exclusion would make the rider illusory because it would not cover negligent

supervision claims when one of Hantz's representatives fails to provide services through knowing wrongful conduct.

Applied to insurance contracts, the illusory coverage doctrine dictates that "an insurance policy [] be interpreted so that it is not merely a delusion to the insured." *Emp'rs Mut. Cas. Co. v. Helicon Assoc., Inc.*, 880 N.W.2d 839, 843 (Mich. Ct. App. 2015) (quoting *Ile v. Foremost Ins. Co.*, 809 N.W.2d 617, 622 (Mich. Ct. App. 2011), *rev'd on other grounds*, 823 N.W.2d 426, 426 (Mich. 2012)). Michigan courts thus "avoid interpreting insurance policies in such a way that an insured's coverage is never triggered and the insurer bears no risk." *Id.* (citations and quotations omitted). But "[the Michigan] Supreme Court will not strike an insurance policy as illusory if there is any manner in which the policy could be interpreted to provide coverage." *Cincinnati Ins. Co. v. Hall*, No. 308002, 2013 WL 3107640, at *6 (Mich. Ct. App. June 20, 2013) (citing *Ile v. Foremost Ins. Co.*, 823 N.W.2d 426, 426–427 (Mich. 2012)).

Hantz fails to establish that the Wrongful Act exclusion, as interpreted, renders the negligent supervision rider illusory. Although the rider would not cover negligent-supervision claims stemming from a representative's knowing wrongful conduct—such as Laursen's embezzlement—it would still cover negligent-supervision claims arising out of the negligent (and unwitting) conduct of one of Hantz's other representatives. In other words, Hantz's coverage under this rider is "not merely a delusion," *see Helicon Assoc., Inc.*, 880 N.W.2d at 843, as Hantz contends: the rider would indemnify Hantz for "all sums" it is "legally obligated to pay" for negligent supervision of certain employees who did not knowingly commit a wrongful act.

For these reasons, we agree with the district court that Laursen's knowing wrongful conduct eliminates coverage under the E&O Policy.

**III.**

We AFFIRM the judgment of the district court in favor of National Union and AISLIC.